UNITED STATES

v.

**Airman Basic Brandon T. ROSE,
United States Air Force.**

ACM 36508.

U.S. Air Force Court of Criminal Appeals.

Sentence Adjudged 11 Oct. 2005.

12 Feb. 2009.

Appellate Counsel for the Appellant: Lieutenant Colonel Mark R. Strickland, Major Shannon A. Bennett, Major John S. Fredland, and Captain Michael A. Burnat.

Appellate Counsel for the United States: Colonel Gerald R. Bruce, Lieutenant Colonel Matthew S. Ward, Major Jeremy S. Weber, Major Jefferson E. McBride, and Captain Coretta E. Gray.

Before FRANCIS, HEIMANN, and THOMPSON, Appellate Military Judges.

## OPINION OF THE COURT

FRANCIS, Senior Judge:

Consistent with the appellant's pleas, a military judge sitting as a general court-martial convicted him of multiple offenses, including: one specification each of attempted larceny, violation of a lawful order, drunk driving, forgery, house breaking, and obstructing justice, in violation of Articles 80, 92, 111, 123, 130, and 134, UCMJ, 10 U.S.C. §§ 880, 892, 911, 923, 930, 934; 11 specifications of larceny, in violation of Article 121, UCMJ, 10 U.S.C. § 921;[1] and three specifications of indecent assault, also in violation of Article 134, UCMJ.[2] The adjudged and approved sentence consists of a dishonorable discharge and confinement for 20 months.[3]

The appellant raises four assignments of error, as further discussed below. Although not raised by the appellant, the Court also examined whether he is entitled to relief because of appellate processing delays. Finding error, we set aside the findings of guilty to the indecent assault offenses and reassess the sentence.

### Ineffective Assistance of Counsel

The appellant asserts he received ineffective assistance of counsel when his trial defense team, and specifically his civilian defense counsel, erroneously advised him that conviction of the indecent assault offenses would not require him to register as a sex offender. Further, he asserts, if he had known that he would have to register as a sex offender, he would not have pled guilty to those offenses. The appellee responds by contending that the appellant has failed to establish that he in fact was given erroneous advice on his obligations to register as a sex offender, or that the prospect of sex offender registration impacted his plea decision.

### General Background

The offenses that underlie this issue involve assaults of three different females, two of them airmen, between March and November 2004. The appellant assaulted one of the airmen in the dorm by entering her room while she was sleeping and trying to run his hand down her shorts and up to her bare chest. She woke when he entered the room, resisted his advances, and kicked him out before it could go further. He assaulted another airman at a party, stealing an unwanted kiss and then reaching between her legs from behind and pulling her toward him by the crotch when she bent to pick up a water bottle.

The third assault victim was the civilian wife of another airman, and a friend of the appellant's wife. One night the victim went to the appellant's house to watch a movie with the appellant's wife. The ladies drank beer and sake while watching the movie and were drunk by the time the appellant re-

---

1. Ten of the thefts were of merchandise valued at less than $500. One was of merchandise valued at more than $500.

2. The indecent assaults occurred prior to 1 October 2007 and were thus charged under Article 134, UCMJ, 10 U.S.C. § 934. *Manual for Courts–Martial, United States*, A27–1–27–2 (2008 ed.).

3. The appellant pled guilty pursuant to a pretrial agreement that limited confinement to 24 months.

turned home. The appellant's wife was not feeling well, so he helped her get into bed to sleep it off. The victim remained to watch the end of the movie, but passed out, waking to find the appellant kissing her. She resisted and told him no, then passed out again. The next time she came to, he had pulled her shirt up and was fondling and kissing her breasts. She again resisted and passed out, but awoke when he tried to get her pants open. At that point, she finally convinced him to stop, and he thereafter helped her home without further incident.

### Sex Offender Registration Advice

The relevant facts were developed at a post-trial hearing ordered by the Court pursuant to *United States v. DuBay*, 37 C.M.R. 411, 1967 WL 4276 (C.M.A.1967). They are set forth below.

At trial the appellant was represented by civilian counsel, Mr. C, and by Capt L, then a relatively new ADC.[4] Both Capt L and the appellant testified that the appellant indicated to his counsel that he was concerned about pleading to the indecent assault charges because he did not want to have to register as a sex offender. Consistent with that concern, the defense initially offered a pretrial agreement (PTA) that would have allowed the appellant to plead guilty to all but the indecent assault charges, in return for a sentence cap of 15–18 months. After the convening authority rejected that offer, the appellant directly asked Capt L if he would be required to register as a sex offender if convicted of the indecent assault charges. Capt L said he did not know, and referred the appellant to Mr. C, his lead counsel. When the appellant thereafter asked Mr. C the same question, Mr. C said he was not sure, but did not see why the appellant would have to, given what Mr. C perceived to be the minor nature of the assaults. Mr. C indicated he would have to check into it to be certain, but never did so. According to the appellant, he asked Mr. C the same question two or three times and always got the same answer.

All, including the appellant, testified that neither Mr. C nor Capt L ever specifically told the appellant he would *not* have to register as a sex offender if convicted of the indecent assault charges. Rather, both attorneys said they were not sure. However, Mr. C at the same time downplayed the severity of the alleged assaults, which he viewed as "fairly innocuous."

At the *DuBay* hearing, the appellant testified that based on Mr. C's responses, he was left with the impression that he would not have to register as a sex offender if convicted of the indecent assault offenses. Claiming reliance on that impression, he entered into a PTA in which he agreed to plead guilty to all charges, including the indecent assault offenses, in return for a sentence cap of 24 months. The appellant testified that he learned he would have to register as a sex offender when confinement personnel advised him of such on the first day of his post-trial confinement. The appellant further testified that if he had known that to be the case, he would not have pled guilty to the indecent assault charges but would have forced the government to prove up those offenses. Similarly, Mr. C testified at the *DuBay* hearing that if he had known registration was required, he would not have advised the appellant to plead guilty. However, Mr. C also testified that potential sex registration requirements were not the appellant's only concern. Rather, the length of potential confinement time "was an overriding concern as well. It was finally settled on the importance of the term of confinement, a limitation of confinement, in deciding to finally plead guilty to [the indecent assault offenses]."

Based on the testimony presented at the hearing, the military judge found in part as follows:

> [S]ex offender registration was a key concern for AB Rose and ... he raised the issue with both his trial defense counsel. Neither of AB Rose's trial defense counsel ever answered AB Rose's question. AB Rose was never told that he would not

---

4. Capt L has since separated from the Air Force and was in civilian practice at the time of his

*DuBay* hearing testimony.

have to register; his question went unanswered. However, AB Rose was given the impression that he would not have to register. This impression was reasonable under the circumstances.

■ The military judge's findings are well supported by the evidence presented at the *DuBay* hearing and are not "clearly erroneous." We accordingly adopt them as our own for purposes of this review, with one caveat.[5] The caveat relates to the judge's finding that the appellant "was never told that he would not have to register." Although the appellant was never told that in those explicit words, the totality of his attorney's responses, and the manner in which those responses were conveyed, effectively amounted to an affirmative misrepresentation as to whether sex offender registration would be required.

### Law and Analysis

"A determination regarding the effectiveness of counsel is a mixed question of law and fact." *United States v. Baker*, 65 M.J. 691, 696 (A.Ct.Crim.App.2007) (citations omitted). "We review findings of fact under a clearly erroneous standard, but the question of ineffective assistance of counsel flowing from those facts is a question of law we review de novo." *Id.* (citations omitted). In assessing such claims, we "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland v. Washington*, 466 U.S. 668, 689, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), *quoted in United States v. Tippit*, 65 M.J. 69, 76 (C.A.A.F.2007). To prevail, the appellant bears the burden of showing both: (1) that his counsel's performance fell measurably below an objective standard of reasonableness and (2) that any perceived deficiency operated to the prejudice of the appellant. *Strickland*, 466 U.S. at 688,

692, 104 S.Ct. 2052; *see also United States v. Polk*, 32 M.J. 150, 153 (C.M.A.1991). With regard to the first prong, "the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances." *Strickland*, 466 U.S. at 688, 104 S.Ct. 2052. With regard to the second prong, an appellant in a guilty plea case "must also show specifically that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Tippit*, 65 M.J. at 76 (citations and quotations omitted).

Applying the above to a claimed failure to advise on the potential collateral consequences of a criminal conviction, our superior court held that counsel's *complete failure to advise* a military accused that he might be subject to sex offender registration requirements if convicted does not constitute deficient performance under the first prong of *Strickland* and so "does not rise to the level of ineffective assistance of counsel." *United States v. Miller*, 63 M.J. 452, 458 (C.A.A.F. 2006).[6] Conversely, numerous federal courts have held that *affirmative misrepresentations* by counsel about significant collateral consequences of a conviction may constitute ineffective assistance of counsel. *See, e.g., United States v. Kwan*, 407 F.3d 1005, 1015–16 (9th Cir.2005); *United States v. Couto*, 311 F.3d 179, 187–88, 191 (2d Cir.2002).

The appellant argues that by downplaying the seriousness of the indecent assault offenses and telling the appellant that he "didn't see why" conviction of those offenses would require registration as a sex offender, Mr. C effectively "affirmatively misrepresented" the collateral consequences of his conviction, thereby bringing the case squarely within the rationale of *Kwan* and *Couto*. We agree.

**5.** We recognize that the military judge's conclusion that AB Rose's impression "was reasonable under the circumstances" is not a finding of fact, but a conclusion reached by the judge based on the other findings of fact.

**6.** *United States v. Miller*, 63 M.J. 452 (C.A.A.F. 2006) also established a prospective rule requiring counsel to affirmatively advise clients on the potential for sex offender registration from the date of that decision forward. *Miller*, 63 M.J. at 459. Further, failure to so advise an accused on such matters after *Miller*, while not *per se* ineffective assistance, is one factor courts will consider in measuring counsel's performance. *Id.* The appellant's court-martial occurred prior to the *Miller* decision and so his counsel's actions were not governed by that rule.

*Kwan* and *Couto* addressed potential deportation of non-U.S. citizens convicted of criminal offenses, a collateral consequence that both courts obviously considered significant. Sex offender registration requirements are no less significant, particularly given the public nature of registered offender lists, the fact that every state in the union has some such requirement, the common restrictions on where those registered may reside within any given community, and the length of time that most offenders are required to remain registered. Indeed, our superior court's decision in *Miller*, to prospectively require that counsel advise clients on the potential for sex offender registration, implicitly recognized the significant impact this particular collateral consequence can have on those convicted of sex crimes. *Miller*, 63 M.J. at 459.

▪ Because sex offender registration requirements are a significant collateral consequence, we hold that counsel's advice on such matters will be held to the same standard enunciated by *Kwan* and *Couto* for deportation advice. That is, affirmative misrepresentations by defense counsel that a military accused, if convicted, will not or likely not be subject to potential sex offender registration, will constitute ineffective assistance of counsel. The question here is whether counsel's actions in this case rise to the level of an "affirmative misrepresentation." We conclude that they do.

With regard to the first prong of the *Strickland* test, we can determine the importance of Mr. C's responses to the appellant's questions about sex offender registration only by considering the entirety of the responses and the context and manner in which they were given. First, while it is evident from Mr. C's *DuBay* hearing testimony that other factors, such as length of potential confinement, were also of concern, it is clear that the appellant was very concerned about potential sex offender registration. He was

so concerned about this that the appellant initially offered a PTA that did not include pleading to the sexual assaults and, when that PTA was rejected, asked his counsel two or three times whether registration would be required for those offenses. Both of his counsel were well aware of the appellant's concern about potential sex offender registration. Indeed, Capt L testified at the *DuBay* hearing that, given the appellant's concern, he was surprised when he heard that the appellant, as part of the second PTA offer, had agreed to plead guilty to the sex offenses. Second, although Mr. C prefaced each response to the appellant's questions about sex offender registration by stating he did not know, or was not sure that his answer was correct, our inquiry cannot stop there. To do so would improperly discount the totality of Mr. C's responses and would ignore the reality of the relationship between a professional legal counsel and the military client relying on that counsel to provide competent advice about the criminal charges against him. Here, the totality of Mr. C's responses to the appellant's questions effectively resulted in a very different answer from that suggested by his verbal caveats alone. Each time, Mr. C went on to also tell the appellant, "I don't see why it [sic] would be with the allegations that were brought against you. I don't see why that [sic] would be a registerable offense." The appellant further testified that when he found the equivocation confusing, he "in the end ... put it in [his] attorney's hands," and asked him "what's the best advice you can give me, you know, what to do?" Mr. C told him, "I don't see no [sic] reason why you'd have to register. My best advice is [to] go ahead and sign the PTA."

▪ Those responses, coupled with Mr. C's tendency to downplay the seriousness of the sexual assaults,[7] left the appellant with the reasonable impression that he would not have to register as a sex offender, and he acted on his counsel's advice.[8] Uneducated

---

7. Mr. C testified that he viewed the indecent assaults as "fairly innocuous types of charges" and "just foolery," and advised the appellant of such during their discussions.

8. This does not mean that ineffective assistance of counsel claims can or should turn on the

client's "impression" as to what his attorney has told him. Rather, the focus remains squarely on the conduct of the attorney. When, as here, the totality of the attorney's advice, including the manner in which it was delivered and viewed from an objective standpoint, was reasonably cal-

in the ways of "lawyer speak," the appellant was not required to further ferret out and eliminate potential inconsistencies in his counsel's response, but was entitled to rely on the totality of the advice given to him by the professional lawyer representing him and whom he understandably expected to know the law. Further, that advice fell measurably below the level of performance reasonably expected of professional legal counsel. As is apparent from the discussion below, even cursory research would have disclosed that conviction of the indecent assaults carried a substantial risk that the appellant *would* have to register as a sex offender.

Turning to the second prong of *Strickland*, it is also clear that the appellant was prejudiced by his counsel's erroneous advice. First, but for that advice, he would not have pled guilty to the indecent assaults. All of the *DuBay* hearing witnesses effectively testified that the potential for sex offender registration was, as the military judge found, "a key concern" of the appellant. Further, the appellant testified that he was surprised when confinement personnel told him that registration was required and that he would not have pled guilty to those offenses if he had known that to be the case. Capt L also testified that the issue was so important to the appellant that he was surprised when he learned that as part of the second PTA, the appellant had agreed to plead guilty to the indecent assault offenses. Finally, Mr. C himself acknowledged that he "wouldn't have advised [the appellant] to plead guilty to those sex offense charges" if he had known sex offender registration was required.

Second, it is apparent that registration is required by federal law.[9] In this regard, appellate counsel's acknowledgement during oral argument that the appellant had not, as

of that date, actually registered as a sex offender anywhere, is not controlling. The key is whether the appellant is legally required to register. If so, then prejudice exists whether he suffers the burden of registration or exposes himself to potential criminal prosecution for failure to comply with the registration requirement.[10]

Federal registration requirements pertinent to the appellant's offenses are set forth in the Sex Offender Registration and Notification Act (SORNA), 42 U.S.C. §§ 16901 *et seq.* Specifically, 42 U.S.C. § 16913(a) provides that "[a] sex offender shall register, and keep the registration current, in each jurisdiction where the offender resides." The statute defines "sex offender" as "an individual who was convicted of a sex offense." 42 U.S.C. § 16911(1). "Sex offenses" include any "criminal offense that has an element involving a sexual act or sexual contact with another." 42 U.S.C. § 16911(5)(A)(i). "Sexual contact," though not defined within the body of SORNA, is elsewhere defined as "the intentional touching, either directly or through the clothing, of the genitalia, anus, groin, breast, inner thigh, or buttocks of any person with an intent to abuse, humiliate, harass, degrade or arouse or gratify the sexual desire of any person." Crimes and Criminal Procedures, 18 U.S.C. § 2246(3). Within the context of this case, at least two of the three indecent assault offenses of which the appellant was found guilty meet this definition. In addition, SORNA also indicates that qualifying "criminal offenses" include those "specified by the Secretary of Defense [SECDEF] under section 115(a)(8)(C)(i) of Public Law 105–119 (10 U.S.C. 951 note)...." 42 U.S.C. § 16911(6). The SECDEF has identified qualifying offenses in Department of Defense Instruction

culated to lead the client to believe one thing, the attorney cannot escape the logical consequences of that advice simply by appending pro forma equivocating language.

9. This portion of our analysis is driven by the nature of the appellant's claim. Because his complaint is based on the need for sex offender registration, the issue remains viable only if he is in fact required to register by a relevant jurisdiction.

10. *See, e.g.,* Sex Offender Registration and Notification Act, 42 U.S.C. §§ 16901 *et seq.;* 42 U.S.C. § 16913(e) (directing that states participating in the national sex offender registration program "provide a criminal penalty that includes a maximum term of imprisonment that is greater than 1 year for the failure of a sex offender to [register when required to do so]"); 42 U.S.C. § 16941(a) (directing the Attorney General to use federal law enforcement resources to help states track down and apprehend offenders who fail to register).

(DODI) 1325.7, *Administration of Military Correctional Facilities and Clemency and Parole Authority* (17 Jul 2001), and such offenses include indecent assault. DODI 1325.7, ¶¶ 6.18.5.1, 6.18.6.1, Enclosure 27. Based on these statutory and regulatory provisions, federal law requires that the appellant register as a sex offender. Given this clear federal registration requirement, we need not further examine the law of the various individual states in which the appellant has indicated an interest in residing.[11]

■ Based on the above, the appellant has met his burden of proof under both prongs of the *Strickland* test. We therefore set aside the findings of guilty to those offenses. This action moots the appellant's further assertion that his plea to Specification 3 of Charge V, alleging indecent assault of Airman First Class (A1C) TMG, was not supported by his *Care*[12] inquiry responses and was therefore improvident.[13] Accordingly, we need not further address that additional assignment of error.

### Cruel and Unusual Punishment

The appellant asserts he was subjected to cruel and unusual post-trial punishment, in violation of the Eighth Amendment[14] and Article 55, UCMJ, 10 U.S.C. § 855, when he was struck and verbally abused by a member of the confinement staff while serving his sentence at the Naval Consolidated Brig, Charleston, SC.[15] The claim is supported by a personal declaration of the appellant, indicating that one of the confinement non-commissioned officers (NCOs) "slapped [the appellant] on the back of the head with the back of his hand," then started "yelling and cursing" at him.[16] The appellant points to a Navy regulation that prohibits correctional staff from physically or verbally abusing prisoners and "striking or laying hands" on prisoners, as evidence that the contact was wrongful.[17]

Shortly after the incident occurred, the appellant filed a complaint with the confinement facility, which initiated an investigation. The investigation confirmed both the physical contact and use of profanity, but concluded that "[t]he severity of the physical contact is uncertain." The investigation report included information from a witness who saw the confinement NCO "tap the back of [the appellant's] head with the back of his hand as if to try to get [his] attention." The same witness deemed it an "insignificant incident." The confinement NCO admitted using profanity and touching the back of the appellant's head, but said the physical contact was an accident. According to the NCO, when the appellant started to walk away after being told to tuck in his shirt, the NCO followed and raised his arm to point to where he wanted the appellant to go. The appellant hesitated and stepped back, causing the NCO's hand to touch his head. Another witness, who saw the motion but not the

11. Capt L testified at the *DuBay* hearing that Illinois, Alabama, and Florida were states with which the appellant was concerned. While the federal registration requirement is alone sufficient to establish prejudice under the facts of this case, our review of the law of each of these state jurisdictions indicates that they too would require registration. *See Rodimel v. Cook County Sheriff's Office*, 354 Ill.App.3d 744, 290 Ill.Dec. 725, 822 N.E.2d 7 (Ill.App.Ct. 1st Dist.2004) (finding a registration requirement for a similarly situated military offender); ALA.CODE §§ 15–20–21(1), 15–20–22 (requiring registration of "adult criminal sex offenders"); FLA. STAT. ch. 943.0435(1)(a)1.b (requiring registration of sex offenders who are otherwise required to register in other jurisdictions).

12. *United States v. Care*, 40 C.M.R. 247, 1969 WL 6059 (C.M.A.1969).

13. By setting aside the finding of guilty to Specification 3 of Charge V, this Court is not addressing whether an unwanted kiss is "not only grossly vulgar, obscene, and repugnant to common propriety, but tends to excite lust and deprave the morals with respect to sexual relations." *Manual for Courts–Martial, United States*, Part IV, ¶ 90.c. (2005 ed.).

14. U.S. CONST. amend. VIII.

15. This issue is raised pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A.1982).

16. The incident occurred when the appellant replied "I'll get right on that" and started to walk away after being told to tuck in his shirt.

17. Secretary of the Navy Instruction (SECNAVINST) 1640.9B, *Department of the Navy Corrections Manual*, ¶¶ 3402(1)(a)-(b) (2 Dec 1996). That regulation was subsequently superseded by SECNAVINST 1640.9C (3 Jan 2006), which contains the same prohibitions.

actual contact, reported that "the [NCO's] gesture did appear to be a pointing motion, but I do believe he was a little to[o] close to [the appellant's] personal space."

We review claims of cruel and unusual post-trial punishment de novo. *United States v. Wise,* 64 M.J. 468, 473 (C.A.A.F. 2007); *United States v. Pena,* 64 M.J. 259, 265 (C.A.A.F.2007). Absent evidence that the appellant has been subjected to one or more of certain enumerated punishments specifically prohibited by Article 55, UCMJ, we apply the same standard to claims of Eighth Amendment and Article 55, UCMJ, violations. *Pena,* 64 M.J. at 265.[18]

Excessive use of force by prison officials can constitute an Eighth Amendment violation. *Hudson v. McMillian,* 503 U.S. 1, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992). While the appellant's claim that the confinement NCO's actions violated applicable confinement regulations could, if true, serve as a basis for corrective action against the NCO, violation of a regulation does not automatically give rise to an Eighth Amendment or Article 55, UCMJ, violation. *United States v. Sanchez,* 53 M.J. 393 (C.A.A.F.2000); *United States v. Avila,* 53 M.J. 99, 102 (C.A.A.F.2000). Rather, to prevail, an appellant asserting an excessive use of force claim must show that prison officials acted "maliciously and sadistically to cause harm." *Hudson,* 503 U.S. at 7, 112 S.Ct. 995. Under this standard, "courts considering a prisoner's claim must ask both if 'the officials acted with a sufficiently culpable state of mind' and if the alleged wrongdoing was objectively 'harmful enough' to establish a constitutional violation." *Id.* at 8, 112 S.Ct. 995 (citations omitted). With regard to the latter, while evidence of "significant injury" is not required, the absence of injury is a factor to be considered. *Id.* at 9, 112 S.Ct. 995. Further, "[not] every malevolent touch by a prison guard gives rise to a federal cause of action." *Id.* (citations omit-

ted). The Eighth Amendment does not protect against "*de minimus* uses of physical force [that are not otherwise] of a sort 're-pugnant to the conscience of mankind.'" *Id.* at 9–10, 112 S.Ct. 995 (citations omitted).

Based on the record before us, there is no question that the confinement NCO's hand did make some kind of contact with the appellant's head. However, assuming, without deciding, that such contact was intentional, there is no evidence that the NCO did so "maliciously and sadistically" so as to cause harm to the appellant.[19] Indeed, even if we accept the appellant's version of events at face value, there is no claim, much less evidence, that he suffered *any* injury, or even pain, of *any* sort from the contact. Under these circumstances, we conclude the contact was *de minimus* and that no Eighth Amendment or Article 55, UCMJ, violation occurred.

### Appellate Processing Delay

We examine post-trial delay issues using the four factors set forth in *Barker v. Wingo,* 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). They are: "(1) the length of the delay; (2) the reasons for the delay; (3) the appellant's assertion of the right to timely review and appeal; and (4) prejudice." *United States v. Othuru,* 65 M.J. 375, 380 (C.A.A.F.2007) (citations omitted).

The first factor, length of the delay, favors the appellant, in that the total amount of time taken to process his case after docketing with this Court, 1,184 days, is facially unreasonable. Turning to the second factor, we find that the reasons for the delay in appellate processing generally either weigh against the appellant or are neutral. A review of the appellate processing chronology[20] indicates that more than one full year of the delay in appellate review was attributable to a delay by the appellant in filing an initial assignment of errors. In addition, the appel-

---

18. In addition to prohibiting "cruel or unusual punishment," Article 55, UCMJ, 10 U.S.C. § 855, prohibits "[p]unishment by flogging, or by branding, marking, or tattooing" and "[t]he use of irons ... except for the purpose of safe custody...." None of the specific prohibitions are at issue here.

19. Although the appellant also complains that the non-commissioned officer (NCO) "yelled" and "cursed" at him during the incident, those facts, while perhaps unpleasant for the appellant, do not convince us that the NCO acted with a "malicious and sadistic" intent.

20. See attached Appendix.

lant later sought and obtained more than 30 days delay in the scheduling of the *DuBay* hearing ordered by the Court to address his ineffective assistance of counsel claim. Beyond the defense delays, the government also sought and obtained 90 days of delay to file its answer to the appellant's initial assignment of errors. However, the basis for the government delays were reasonable, in that they were in part needed to allow time to obtain an affidavit from trial defense counsel relative to the ineffective assistance of counsel claim and to obtain a copy of a confinement facility report referenced in the appellant's initial assignment of errors.

With one exception, the remaining periods of time taken to complete appellate review in this case were also reasonable. Some cases, by their very nature, simply take more time to resolve than others. This is such a case, as additional time was required because of the ordered *DuBay* hearing and to fully address the issues raised. The only exception was the amount of time taken to publish the Court's order directing a *DuBay* hearing. Although the Court issued its order on 7 September 2007, an administrative error delayed its distribution to the parties until 17 October 2007. While the length of the resulting delay was relatively insignificant when considered within the context of the entire case, we nonetheless find this small portion of the overall delay to be unreasonable.

The third factor weighs against the appellant. At no time did the appellant complain about the post-trial delay in his case. Indeed, as indicated above, a significant portion of the delays in this case were the result of defense requests.

The fourth factor weighs slightly in the appellant's favor. Given the Court's disposition of the appellant's ineffective assistance of counsel claim, and the resulting reduction in the approved sentence, it is possible, though not certain, that he would have served less time in confinement had the case been resolved earlier. Moreover, even though the appellant's counsel, during oral argument, advised the Court that the appellant had not, as of that date, actually registered as a sex offender in any jurisdiction,

the mere fact that he was required to register was in some sense prejudicial, in that his failure to do so exposed him to potential criminal prosecution.

Considering all of the above, and balancing all of the *Barker* factors, we conclude there has been no denial of the appellant's due process right to a timely review and appeal.

## Conclusion

The findings of guilty as to Specifications 1, 2, and 3 of Charge V are set aside. The findings of guilty as to the remaining charges and specifications are affirmed. The sentence is also set aside. A rehearing is authorized with respect to Specifications 1, 2, and 3 of Charge V and the sentence. If a rehearing on findings is deemed impracticable, the convening authority may order a rehearing on the sentence alone to determine an appropriate sentence for the affirmed findings of guilty. If the convening authority determines that a rehearing on the sentence is impracticable, the convening authority may reassess the sentence.

THOMPSON, Judge (Concurring in part, Dissenting in part).

I join the majority's opinion on all issues except the appellant's ineffective assistance of counsel claim. There I must respectfully dissent.

As the majority notes, affirmatively misleading a criminal defendant about significant collateral consequences of a criminal conviction can rise to the level of ineffective assistance of counsel. *United States v. Kwan,* 407 F.3d 1005, 1015–16 (9th Cir.2005); *United States v. Couto,* 311 F.3d 179, 187–88, 191 (2d Cir.2002). However, this is not such a case. Rather, for the reasons set forth below, I find the appellant failed to establish an affirmative misrepresentation on the part of his attorneys and conclude the appellant failed to meet either prong of *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

### Ineffective Assistance of Counsel

#### Performance

The *Strickland* totality of the circumstances test mandates that we determine the

import of Mr. C's responses to the appellant's questions about sex offender registration by considering the entire response within the context of the entire case. It is clear from the appellant's own testimony at the *DuBay*[21] hearing that Mr. C prefaced each response to the appellant's questions by saying he did not know or was not sure of the answer, and indicated that he would have to research the matter further to determine the answer. The appellant testified at the *DuBay* hearing that he "probably brought it up to him two or three times." Based on that response, the appellant clearly knew that he did not have a definitive answer to his question, yet nonetheless elected to proceed forward with the pretrial agreement (PTA), relying only on his "impression" that he would not have to register as a sex offender if convicted. I also find it instructive that the appellant, prior to raising the question with Mr. C and Capt L, had "heard rumors" that he might indeed have to register as a sex offender, so was already aware that it might be a possibility.[22] Although the appellant indicated that such rumors "were put to an end by my counsel," the totality of his *DuBay* testimony, and specifically his acknowledgement that Mr. C told him he did not know the answer, belies that statement. The *DuBay* hearing military judge found the appellant was never told that he would not have to register. Thus, I conclude that the appellant's attorney never made an affirmative representation, but simply failed to effectively answer the appellant's question directly and clearly.

Therefore, just as the complete failure to provide any advice on the need to register as a sex offender as a consequence of a criminal conviction has been held to be within the range of professional competence, I conclude that counsel's acknowledgement, in response to questions two or three times about such consequences, that he did not know, is also not constitutionally deficient performance within the meaning of prong one of *Strickland*. As our superior court has indicated in *United States v. Miller*, 63 M.J. 452 (C.A.A.F.2006), the Constitution does not require criminal defense counsel to be all-knowing, especially in the area of law here at issue, which encompasses a "plethora of sexual offender registration laws enacted in each state...." *Miller*, 63 M.J. at 459. Additionally, an impression held by an appellant with respect to an issue, even a reasonable impression, is not sufficient to conclude this rises to the level of ineffective assistance of counsel. To hold otherwise opens the floodgates to all manners of impressions an accused may draw from his counsel's demeanor, words, or lack of response.

While the failure to address questions regarding sex offender registration, in the face of repeated questioning, is not acceptable, I find no authority for the conclusion that this failure amounts to a constitutional defect, particularly in the face of Supreme Court precedence highlighting that "the concern with finality served by the limitation on collateral attack has special force with respect to convictions based on guilty pleas." *United States v. Timmreck*, 441 U.S. 780, 784, 99 S.Ct. 2085, 60 L.Ed.2d 634 (1979). To conclude otherwise would simply encourage collateral attacks of guilty pleas whenever a defense counsel fails to answer every question related to a collateral consequence of a guilty plea posed by an accused. While I agree with the majority that sex offender registration is a serious issue, the fact remains, it is a collateral issue that constitutionally is outside the scope of any inquiry regarding the Sixth Amendment[23] right to counsel.

---

**21.** *United States v. DuBay,* 37 C.M.R. 411, 1967 WL 4276 (C.M.A.1967).

**22.** The appellant did not specify the source of such rumors. At the *DuBay* hearing, the appellant indicated that he had been represented by another military defense counsel prior to his representation by Mr. C and Capt L. Upon the objection of the appellant, the military judge prohibited the government from questioning the appellant concerning what, if any, advice he had received from his prior counsel on sex offender registration and prohibited the government from calling the prior counsel as a witness for that purpose. This Court similarly denied a government motion to direct an affidavit from the prior counsel on this issue.

**23.** U.S. Const. amend. VI.

### Prejudice

I also conclude the appellant has failed to establish the prejudice prong of the *Strickland* test. The Supreme Court has held the prejudice requirement of *Strickland* "focuses on whether counsel's constitutionally ineffective performance affected the outcome of the plea process. In other words, in order to satisfy the 'prejudice' requirement, the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. 52, 59, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985). The appellant has not met this burden.

The mere fact that the appellant, knowing that he did not have a definitive answer, nonetheless was still willing to enter into a favorable PTA and plead guilty to the indecent assaults strongly contradicts his *DuBay* testimony that he would not have pled guilty to those offenses if he had known he was required to register. Simply put, his actions speak louder than his appellate protestations to the contrary. From his willingness to plead guilty without a definitive answer, I conclude that while sex offender registration was, as the *DuBay* judge found, a "key concern," it was not the controlling concern. Rather, as Mr. C testified, the length of potential confinement "was an overriding concern" and the decision to plead guilty to the indecent assault offenses "was finally settled on the importance of the term of confinement, a limitation of confinement...."[24] The appellant faced significant potential confinement of 41 years and 6 months for the offenses he was charged with as compared to the 24–month confinement cap pursuant to the PTA.[25] The *DuBay* hearing testimony contained references to PTA negotiations immediately prior to trial surrounding the three indecent assault charges. Mr. C testified this was heavily negotiated. Without the three indecent assault charges being included in the PTA, the record indicates the government would not approve the PTA. In fact,

the appellant testified at the *DuBay* hearing that Mr. C told him to "plead out so we have a safety net of twenty-four months, and then we try to beat the twenty-four months with the different extracurricular activities and the sentencing phase...." The record is clear. Limiting the confinement length was the controlling concern surrounding the decision to plead guilty to all the charges and specifications, including the three indecent assault specifications.

Review of the entire record reveals additional support for concluding that the appellant failed to establish that he was prejudiced. During the trial, the military judge inquired into the terms of the PTA and the appellant's plea. The relevant excerpts are as follows:

MJ: Have you had enough time to discuss this agreement with your defense counsel?

ACC: Yes, sir.

MJ: Are you satisfied with their advice concerning the agreement is in your best interest?

ACC: Yes, Your Honor.

MJ: Did you enter into the agreement of your own free will?

ACC: Yes, sir.

MJ: Has anyone tried to force you to enter into the agreement?

ACC: No, sir.

MJ: Do you have any questions about the agreement?

ACC: No, sir.

MJ: Do you fully understand all the terms of the agreement and how they affect your case?

ACC: Yes, sir.

. . . .

MJ: Thank you. Airman Rose, have you had enough time and opportunity to discuss this case with both your defense counsel?

ACC: Yes, sir.

---

24. Having so found, I need not determine whether or not the appellant was in fact required to register as a sex offender.

25. Both the trial and defense counsel calculated the maximum punishment to include 37 years confinement; this minor miscalculation did not prejudice the appellant.

MJ: Have you, in fact, consulted fully with your defense counsel and received the full benefit of their advice?

ACC: Yes, sir.

MJ: Are you satisfied that their advice is in your best interest?

ACC: Yes, sir.

MJ: Are you satisfied with your defense counsel?

ACC: Yes, sir.

. . . .

MJ: All right. Airman Rose, I don't believe anything this morning or this afternoon has taken you by surprise. Nevertheless, if you would like, we've had extended delays and recesses. I'll be happy to give you any more time you need to discuss any outstanding issues or questions you have with your lawyers, or we can press on. That's your call. Do you want to take a minute, or do you want to press on?

ACC: We can press on, sir.

The appellant had the opportunity to clear up this important issue with the military judge or with his counsel, but did not do so. The appellant knew he did not have an answer, yet he also knew he was gaining the benefit of a limit on confinement length. If the issue was as important to the plea as the appellant is now asserting, he would have taken this opportunity to clarify the issue.

Furthermore, review of the appellant's actions following sentencing and during clemency provide additional support that the appellant has not shown he was prejudiced. As background, the appellant testified in the *DuBay* hearing that upon entry into confinement he found out he would have to register as a sex offender. He testified he was "real upset" and "real mad" at his counsel. The *DuBay* hearing judge asked him, "So you at no point wanted to talk to either of them about the advice they gave you when you found out you were going to have to register?" The appellant answered: "No ma'am, I didn't want to talk to either one of them about it." The appellant testified that he did call his mother and "got in touch with some of her friends that are attorneys that started trying to find out information." The appel-

lant was sentenced on 11 October 2005 and submitted clemency dated 3 November 2005. The clemency submission included a memo from the military trial defense counsel, a two-page memo from the appellant, and four letters from family members. There is not one reference in the clemency submission to the sex offender registration issue. The letters from family request the confinement be shortened and the discharge be changed. Even the letter from his mother has no mention of the sex offender registration issue. The defense counsel asks that confinement be shortened to 15 months. Finally, the appellant's own clemency memo requests the confinement be shortened to 15 months and contains nearly two pages of justification for granting clemency, but no mention of the sex offender registration issue. It is reasonable to conclude that had this issue been *the* reason the appellant pled guilty to the three indecent assault specifications, the issue would have been raised during clemency.

Based on the above, the appellant has failed to meet his burden as to both prongs of *Strickland* and his ineffective assistance of counsel claim is therefore without merit. I accordingly now turn to the additional assertions of error not specifically addressed by the majority.

### Providency of Plea

The appellant asserts that his plea to Specification 3 of Charge V, alleging indecent assault of Airman First Class (A1C) TMG, was improvident.

We review a military judge's decision to accept a plea of guilty for abuse of discretion and will not set aside a plea of guilty on appeal unless there is "substantial basis" in law or fact for questioning the plea. *United States v. Inabinette*, 66 M.J. 320, 322 (C.A.A.F.2008) (internal quotations omitted). "If an accused 'sets up a matter inconsistent with the plea' at any time during the proceeding, the military judge must either resolve the apparent inconsistency or reject the plea." *United States v. Garcia*, 44 M.J. 496, 498 (C.A.A.F.1996) (quoting Article 45(a), UCMJ, 10 U.S.C. § 845(a)) (citing Rule for Courts–Martial (R.C.M.) 910(h)(2)). "Once the military judge has accepted a plea as provident and has entered findings based on

it, an appellate court will not reverse that finding and reject the plea unless it finds a substantial conflict between the plea and the accused's statements or other evidence of record. A 'mere possibility' of such a conflict is not a sufficient basis to overturn the trial results." *Id.* (citations omitted).

The specification at issue alleged that the appellant indecently assaulted A1C TMG "by kissing her and grabbing her by the crotch." At trial, evidence of the offense was provided by a stipulation of fact and by the appellant's admissions during the *Care*[26] inquiry. According to the stipulation of fact, the assault occurred at a party attended by 15–20 people, where the appellant "tried to make a pass at [A1C TMG]" and "kissed her twice without her consent." The stipulation also indicates that when A1C TMG later bent down to pick up a water bottle, the appellant "slid his hand down the center of her buttocks from behind and grabbed her by the crotch ... pull[ing] her backwards at the same time." The stipulation specified that the appellant's assaults on A1C TMG were done "with the intent to gratify his sexual desires."

During the *Care* inquiry, the appellant provided additional details of his actions toward A1C TMG. With regard to the kissing incident, he indicated in part: "I made a little advance on her. I told her to give me a kiss on the cheek. When she leaned over to do that, I moved my lips toward hers and met her lips to lips. Then, the second time, I tried to kiss her on the lips, which didn't work. She turned away."

With regard to the allegation that he grabbed A1C TMG's crotch, the appellant indicated that "[w]hen she bent over to grab the water bottle, [he] reached under her legs and pulled her to [him]." Later during the inquiry, the following additional colloquy occurred between the military judge and the appellant:

MJ: Tell me about the grabbing of the crotch. You told me that you reached between or under her legs. Is that right?

ACC: Yes, sir.

MJ: Where was she facing as you did that?

ACC: She was actually—came over to grab something, and I kind of just reached up and pulled like this way at her stomach with my arm all the way up towards me.

MJ: Okay. Airman Rose has extended his right hand, palm up, and pulled the palm back toward his face.

Based on the above exchanges, the appellant now argues that because A1C TMG consented to kiss the appellant on the cheek, the kiss that actually occurred, when he met her "lips to lips," was itself arguably consensual. He asserts that the judge should therefore at least have explained to him the potential defense of mistake of fact as to whether or not A1C TMG consented to the kiss. As to the allegation that he grabbed A1C TMG's crotch, the appellant asserts that his testimony that he placed his arm between her legs and pulled her toward him is inconsistent with the stipulation of fact assertion that he slid his hand down her buttocks and grabbed her crotch. He argues that the military judge should have resolved the discrepancy before accepting his plea, but did not. Finally, with respect to both actions, the appellant asserts there was not a sufficient basis for the judge to find that the appellant acted with "unlawful force or violence" or with the intent to "gratify his lust or sexual desires." He cites *United States v. Hoggard*, 43 M.J. 1 (C.A.A.F.1995), for the proposition that not every kiss or attempted kiss, even if done with romantic intent, necessarily encompasses an intent to gratify the lust or sexual desires of the kisser. Likewise, with respect to the purported crotch grabbing, he asserts that "attempts at crude horseplay" also do not evidence the intent required for the offense of indecent assault.

I find no merit in the appellant's arguments. The stipulation of fact, which he signed and the military judge properly admitted at trial, sets forth sufficient facts to establish all the required elements of indecent assault. Nor is there any material conflict between the stipulation of fact and the appellant's admissions during the *Care* inqui-

**26.** *United States v. Care*, 40 C.M.R. 247, 1969 WL   6059 (C.M.A.1969).

ry.[27] A1C TMG's consent to kiss the appellant on the cheek did not, under the facts of this case, equate to consent to what the appellant now refers to as the "lip-lock" he instead gave her. Further, her consent to one kind of kiss did not, without more, raise the specter of a mistake of fact defense as to the other. On the contrary, the stipulation of fact specifically indicates that A1C TMG did not consent to the appellant's "lip-lock" and the appellant specifically admitted to the military judge that the kiss he gave A1C TMG was "different from that offered" and was "against her will and without her consent." The fact that such admissions were in response to questions by the military judge does not make them any less compelling. The appellant also specifically admitted that he had no legal justification or excuse for laying a "lip-lock" on A1C TMG without her consent.

I also find no significant conflict between the stipulation of fact and the appellant's explanation to the judge of how he grabbed A1C TMG's crotch. When examining the providency of a challenged guilty plea, we are ever mindful that it is human nature for an accused to rationalize his own behavior or to paint his actions in as favorable a light as possible. *United States v. McCrimmon*, 60 M.J. 145, 152 (C.A.A.F.2004). Accordingly, minor variations or omissions in an accused's discussion of his offenses with the military judge are neither unexpected nor fatal to a guilty plea. In any event, even taking the appellant's explanation during the *Care* inquiry literally, the stipulation of fact does not indicate exactly how the appellant "grabbed" the victim's crotch, nor what part of his own body he used to do so. From the additional details provided by the appellant in his discussion with the military judge, it is evident, though not expressly stated, that he may have grabbed A1C TMG's crotch not with his hand, but with the crook of his arm when he reached up between her legs from behind and pulled her back toward him with his hand on her stomach. There is no indication

that the victim found the appellant's behavior any less offensive simply because he grabbed her crotch with his arm instead of his hand, nor does such after-the-fact appellate word parsing negate the providency of his plea.

The appellant's current contention that neither the kiss nor the crotch grabbing was done with the requisite intent to gratify his lust or sexual desires is contradicted by the record. The stipulation of fact specifically indicates that the appellant acted with such intent. Similarly, when the military judge, referring to both actions, asked the appellant what he was trying to do, the appellant replied "I was trying to pretty much gratify my sexual desires." That response, under oath, to an open ended question by the military judge, speaks volumes. Indeed, who better than the appellant to know his own intent? Thus, while the appellant correctly notes that not every stolen kiss or attempt at "crude horseplay" constitutes an indecent assault, either can, given the right circumstances and intent. The record, including the appellant's explanation of his offenses during the *Care* inquiry, demonstrates beyond a reasonable doubt that such circumstances and intent are present here.

### Sentence Appropriateness

The appellant also asserts that the portion of the adjudged and approved sentence extending to a dishonorable discharge is inappropriately severe.[28]

This Court reviews sentence appropriateness de novo. *United States v. Baier*, 60 M.J. 382 (C.A.A.F.2005). We make such determinations in light of the character of the offender, the nature and seriousness of his offenses, and the entire record of trial. *United States v. Snelling*, 14 M.J. 267, 268 (C.M.A.1982); *United States v. Rangel*, 64 M.J. 678, 686 (A.F.Ct.Crim.App.2007).

Having carefully considered the nature of the appellant's offenses and the other evidence of record properly admitted at trial, I find the adjudged and approved sentence to

---

**27.** The appellant correctly observes that although the stipulation of fact indicates that he twice kissed A1C TMG without her consent, the *Care* inquiry colloquy indicates he did so only once, and that his second attempt to do so was unsuc-

cessful. This minor discrepancy is insignificant and lacks any potential prejudicial impact.

**28.** This issue is raised pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A.1982).

be fair, just, and appropriate. The offenses of which the appellant was convicted are both many and serious. In addition, the appellant had an established track record of prior disciplinary actions, including a prior civilian conviction for driving while intoxicated and a prior nonjudicial punishment action for failing to go to his place of duty, making a false official statement, and willfully disobeying the order of a noncommissioned officer. Given his offenses and record, a dishonorable discharge is not inappropriately severe.

## APPENDIX
### Appellate Processing Chronology

| *Dates* | *Events* |
| --- | --- |
| 11 Oct 05 | Trial completed. |
| 17 Nov 05 | Case initially docketed with the Court. |
| 14 Feb 06–21 Nov 06 | Delay granted to the appellant to file assignment of errors. (Does not include the normal 60 days allotted appellant to file assignment of errors or the 30–day automatic extension of time provided by the Court's Rules of Practice and Procedure.) |
| 21 Nov 06 | Appellant filed initial assignment of errors, raising three assertions of error. |
| 18 Dec 06–23 Mar 07 | Delay granted to the government to file answer, obtain affidavit from trial defense counsel, and obtain a confinement facility report of investigation referenced in the appellant's assignment of errors. (Does not include the normal 30 days allotted the government by the Rules to file answer.) |
| 23 Mar 07 | Government filed answer, along with initial trial defense counsel affidavit and confinement facility report. |
| 28 Jun 07 | Court found the initial trial defense counsel affidavit lacking, and directed the government to obtain an additional affidavit directly addressing the IAC * issue raised by the appellant. |
| 1 Aug 07 | Government filed the required additional affidavit. |
| 7 Sep 07 | Court ordered a *DuBay* hearing to address the IAC issue, directing completion by 21 Oct 07. An administrative error delayed distribution of the Court's order until 17 Oct 07. |
| 24 Oct 07 | Convening Authority (CA) directed *DuBay* hearing IAW the Court's Order. |
| 9 Nov 07 | Appellant requested a delay until 1 Feb 08 to complete the *DuBay* hearing. |
| 13 Nov 07 | Convening order published. |
| 15 Nov 07 | *DuBay* judge, with the agreement of the appellant and the government, set the hearing for 8 Jan 08. Action initiated to bring the appellant back to active status from appellate leave for the hearing. |
| 8 Jan 08 | *DuBay* hearing. |
| 28 Jan 08 | *DuBay* record transmitted to the Court. |
| 28 Mar 08 | Appellant filed supplemental assignments of error, re-addressing the IAC issue in light of the *DuBay* result and raising a new, unrelated assertion of error. |

* Ineffective assistance of counsel.

| | |
|---|---|
| 11 Apr 08 | Appellant filed supplemental citation of authority and analysis. |
| 28 Apr 08 | Government filed answer to supplemental assignments of error. |
| 23 May 08 | Court specified issue, directing the parties to further address potential prejudice to the appellant arising from the asserted IAC error. |
| 20 Jun 08 | Appellant filed second supplemental assignment of errors, addressing the specified issue. |
| 26 Jun 08 | Appellant moved for oral argument on the IAC and specified issues. |
| 21 Jul 08 | Government filed answer to second supplemental assignment of errors. |
| 24 Jul 08 | Court granted request for oral argument and, in consultation with the appellant and the government, set argument for 28 Aug 08. |
| 11 Aug 08 | Court changed argument date to 27 Aug 08. |
| 25 Aug 08 | Appellant filed second supplemental citation of authority and analysis. |
| 26 Aug 08 | Appellant filed third supplemental citation of authority and analysis. |
| 27 Aug 08 | Oral argument. |
| 3 Sep 08 | Government filed motion asking the Court to order an affidavit from the appellant's first assigned defense counsel, who is not named in the IAC claim. |
| 11 Sep 08 | Appellant filed reply. |
| 22 Sep 08 | Court denied government motion. |